[ORAL ARGUMENT NOT YET SCHEDULED]
NO. 14-5076

_____

IN THE UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

_____

ASSOCIATED BUILDERS AND CONTRACTORS, INC.,

Plaintiff-Appellant,

v.

PATRICIA SHIU, *et al*.

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

**BRIEF FOR *AMICI CURIAE* AMERICAN ASSOCIATION OF PEOPLE
WITH DISABILITIES, THE JUDGE DAVID L. BAZELON CENTER
FOR MENTAL HEALTH LAW, AND THE EPILEPSY FOUNDATION**

_____

Jennifer Mathis
Emily B. Read
The Judge David L. Bazelon
Center for Mental Health Law
1101 15th Street NW
Suite 1212
Washington, DC 20005
(202) 467-5730
jenniferm@bazelon.org
emilyr@bazelon.org

Daniel F. Goldstein
Laura Ginsberg Abelson
BROWN, GOLDSTEIN, & LEVY
120 Baltimore Street
Suite 1700
Baltimore, MD 21202
(410) 962-1030
dfg@browngold.com
labelson@browngold.com

*Counsel for Amici*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENTS OF IDENTITY AND INTEREST OF *AMICI CURIAE*.................................................................................... 1

RULE 29(c)(5) STATEMENT ............................................................ 4

INTRODUCTION ............................................................................ 5

ARGUMENT .................................................................................. 7

    I.    The purpose of Section 503 of the Rehabilitation Act was to ensure that federal contractors would be leaders in integrating people with disabilities into the workplace. ..................... 7

    II.    The Department of Labor appropriately imposed data collection requirements on the construction industry. ........................ 9

    III.    Data collection concerning all job applicants with disabilities, regardless of whether they have yet been deemed "qualified" for a specific position, serves the goals of the Rehabilitation Act............................................... 10

    IV.    The Department of Labor appropriately imposed a utilization goal for employment of people with disabilities on all industries, including the construction industry. ........................................................................... 12

        a.    The utilization goal is appropriate and achievable because people with disabilities can and do perform construction industry jobs.......................................... 13

        b.    Contractors made similar arguments concerning utilization goals for employment of women, and those arguments were rejected as unfounded. ............................ 18

        c.    Differences among industries do not make a utilization goal inappropriate..................................... 20

      d.  The 7% utilization goal provides flexibility and
should not be difficult to meet. ....................................................21

          1.  A broad group of people with disabilities count
toward the 7% goal...............................................................21

          2.  People with disabilities now represent almost
12% of employees across the federal
government, including in physically demanding
jobs. .......................................................................................24

CONCLUSION ...................................................................................25

CERTIFICATE OF COMPLIANCE....................................................27

# TABLE OF AUTHORITIES

## Cases

*Echazabal v. Chevron USA, Inc.,*
      336 F.3d 1023 (9th Cir. 2003) ........................................................17

*Gillen v. Fallon Ambulance Serv., Inc.,*
      283 F.3d 11 (1st Cir. 2002) ...........................................................17

*Holiday v. City of Chattanooga,*
      206 F.3d 637 (6th Cir. 2000) ........................................................17

*Lowe v. Alabama Power Co.,*
      244 F.3d 1305 (11th Cir. 2001) ....................................................17

*Rodriguez v. ConAgra Grocery Prod. Co.,*
      436 F.3d 468 (5th Cir. 2006) ........................................................16

## Statutes

29 U.S.C. § 701 ................................................................................8, 26

29 U.S.C. § 705 ....................................................................................22

29 U.S.C. § 791 ............................................................................. 14, 18

29 U.S.C. § 793 ................................................................................8, 22

42 U.S.C. § 12102 ................................................................................22

42 U.S.C. § 12112 ........................................................................ 14, 18

## Regulations

41 C.F.R. § 60-4 ........................................................................... 18, 19

**Other Authorities**

43 Fed. Reg. 14888 ...................................................................................18

43 Fed. Reg. 14893 ...................................................................................18

American Community Survey,
    https://www.census.gov/people/disability/methodology/acs.html ..................22

Bureau of Labor Statistics, Table A, Employment status of the civilian
    noninstitutional population by disability status and age, 2012 and
    2013 annual averages, www.bls.gov/news.release/disabl.a.htm ...................5, 9

Comments of Consortium of Citizens with Disabilities members
    submitted Feb. 21, 2012 in response to the Department's Notice
    of Proposed Rulemaking, available at
    http://www.bazelon.org/portals/0/employment/503%20comments
    %20CCD%202%2021%2012.pdf ...................................................................24

Department of Labor, Office of Federal Contract Compliance
    Programs, Affirmative Action and Nondiscrimination
    Obligations of Contractors and Subcontractors Regarding
    Individuals with Disabilities, Notice of Proposed Rulemaking, 76
    Fed. Reg. 77056, 777069 (Dec. 9, 2011) ........................................................25

Department of Labor, Office of Federal Contract Compliance
    Programs, Final Rule, Affirmative Action and Nondiscrimination
    Obligations of Contractors and Subcontractors Regarding
    Individuals With Disabilities, 78 Fed. Reg. 58682, 58703-04
    (Sept. 24, 2013), www.gpo.gov/ fdsys/pkg/FR-2013-09-
    24/pdf/2013-21228.pdf .............................................................................5, 23

Disability Employment 3: EEO-1 Job Categories by Disability Status,
    Sex, and Race/Ethnicity, Total Population, Number Universe,
    DOL Disability Employment Tabulation 2008-2010 (3-year ACS
    data) (available at
    http://factfinder2.census.gov/faces/tableservices/jsf/pages/produc
    tview. xhtml?src=bkmk ...............................................................................15

EEO-1 Job Classification Guide (available at
    www.eeoc.gov/employers/eeo1survey/jobclassguide.cfm ............................15

Executive Order No. 11246 ............................................................. 18, 19

Executive Order No. 13548 ...................................................................24

Occupational Safety and Health Administration (OSHA), 2012 Survey
    of Occupational Injuries and Illnesses, November 7, 2013,
    (available at http://www.bls.gov/iif/oshwc/osh/os/osch0049.pdf...................20

OPM, Employment of People with Disabilities in the Federal
    Executive Branch FY 2012 Report (Dec. 19, 2013), available at
    www.opm.gov/policy-data-oversight/diversity-and-
    inclusion/reports/disability-report-fy2012.pdf...................................24

Statement by Thomas C. Shanahan, Vice President for Legal Affairs
    and General Counsel, The University of North Carolina, Before
    the House Education and the Workforce Committee,
    Subcommittee on Workforce Protections, Hearing on Examining
    Recent Actions by the Office of Federal Contract Compliance
    Programs, December 4, 2013, at 9, (available at
    http://edworkforce.house.gov/uploadedfiles/shanahan_testimony.
    pdf.................................................................................21

United States Census Bureau, 2012 American Community Survey 1-
    Year Estimates, Selected Economic Characteristics for the
    Civilian Noninstitutionalized Population by Disability Status,
    factfinder2.census.gov
    /faces/tableservices/jsf/pages/productview.xhtml? src=bkmk........................14

v

**STATEMENTS OF IDENTITY AND INTEREST OF *AMICI CURIAE***

**The American Association of People with Disabilities**

The American Association of People with Disabilities (AAPD), founded in 1995 and headquartered in Washington, D.C., is the largest national nonprofit disability rights organization in the United States.  AAPD promotes equal opportunity, economic power, independent living, and political participation for people with disabilities.  Its members, including people with disabilities and family, friends, and supporters, represent a powerful force for change. AAPD and its members work to uphold the civil rights of all Americans with disabilities through the effective enforcement and implementation of civil rights laws including the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973.

**The Judge David L. Bazelon Center for Mental Health Law**

Founded in 1972 as the Mental Health Law Project, the Judge David L. Bazelon Center for Mental Health Law is a national nonprofit advocacy organization that provides legal assistance to individuals with mental disabilities. Through litigation, public policy advocacy, training and education, the Center works to advance the rights and dignity of individuals with mental disabilities in all aspects of life, including employment.  The Center played an important role in securing the passage of the ADA and the 2008 amendments to the ADA and the

Rehabilitation Act.  The Center has extensive experience with advocacy under the

ADA and the Rehabilitation Act concerning disability-based employment

discrimination, and has participated as *amicus* in virtually every case heard by the

U.S. Supreme Court concerning the employment rights of individuals with

disabilities.

## Epilepsy Foundation of America

The Epilepsy Foundation of America (also known as the "Epilepsy

Foundation") is a nonprofit corporation founded in 1968 to advance the interests of

the 2.8 million Americans with epilepsy (chronic seizures). Together with its 47

affiliates throughout the nation, the Epilepsy Foundation maintains and

disseminates up-to-date, accurate information about epilepsy/seizure disorders,

promotes public understanding of the disorder, and supports research, invests and

supports the development of new therapies, and advocates on behalf of people with

seizure disorders. The term "epilepsy" evokes stereotyped images and fears which

affect persons with this medical condition in all aspects of life. Since its inception,

the Epilepsy Foundation of America has stood against the stigma and

discrimination associated with seizures.  Our organization supports the

development and full implementation of laws which promote the employment of

people with disabilities like epilepsy (also called seizure disorders) who, as a result

of stereotypes and misunderstanding about such conditions, have been historically

2

underemployed.  Despite the passage of the Rehabilitation Act of 1973, as amended, and the ADA of 1990, as amended, studies document that 25 percent of people with epilepsy are unemployed.  Among those with frequent seizures, the unemployment rate approaches 50 percent.  At the same time, based on our experience with employment and other programs, the Foundation knows that people with epilepsy are able to successfully perform a wide variety of jobs – including jobs and apprentice programs in the manufacturing and construction industries.  The Foundation supports the vigorous implementation of the laws, including Section 503 of the Rehabilitation Act.  We support the Department of Labor's new regulations calling for collection of data on applicants and hiring for all government contractors to whom the law and regulations apply.

## RULE 29(c)(5) STATEMENT

This brief was not authored in whole or in part by any party's counsel.  No party or its counsel contributed money that was intended to fund preparing or submitting this brief.  No person other than the *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

# INTRODUCTION

The United States Department of Labor, having determined that its prior regulations implementing Section 503 of the Rehabilitation Act of 1973 had "resulted in little improvement in the unemployment and workforce participation rates of individuals with disabilities,"[1] in 2013 appropriately promulgated new regulations that impose data collection requirements and set a utilization goal for certain government contractors in order to promote the employment of people with disabilities.  Against the backdrop of a continuing problem of dramatic unemployment and underemployment of individuals with disabilities, these small steps will, for the first time, provide contractors with a benchmark against which to measure their affirmative action efforts.  They will also shed light on hiring and employment patterns such that the federal government and contractors themselves can identify when recruitment and retention strategies are not working and other measures should be explored.  Federal contractors' affirmative action obligations

---

[1] U.S. Dep't of Labor, Office of Federal Contract Compliance Programs, Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals with Disabilities, Notice of Proposed Rulemaking, 76 Fed. Reg. 77056, 777069 (Dec. 9, 2011).  In 2012 people with disabilities had a labor force participation rate of 20.6%, compared with 69.4% for people without disabilities.  Bureau of Labor Statistics, Table A, Employment status of the civilian noninstitutional population by disability status and age, 2012 and 2013 annual averages, available at www.bls.gov/news.release/disabl.a.htm as of July 2, 2014 (note that this data is based on the Current Population Survey (CPS), which captures a narrower group of individuals with disabilities than Section 503 and the ADA).

with respect to race and gender have long included such utilization goals and data collection; the new Section 503 regulations bring sorely needed updates to similar protections for individuals with disabilities.

The arguments of Appellant Associated Builders and Contractors ("ABC") in this case, which are based on longstanding stereotypes and misconceptions about the abilities of people with disabilities to work, demonstrate exactly why data collection and utilization goals are critical in furthering the goals of the Rehabilitation Act. ABC contends that the Rule is arbitrary and capricious and exceeds the Department of Labor's rulemaking authority because ABC assumes that "significant number[s]"[2] of people with disabilities are not qualified to work in uniquely "physically hazardous"[3] construction industry occupations. ABC's arguments overlook the millions of people with disabilities who already work in the construction industry and in other physically demanding and hazardous occupations.

ABC's arguments also echo assertions made in past years against the Department of Labor's affirmative action regulations to promote the hiring of women. In the late 1970's when the Department of Labor promulgated those

---

[2] Brief of Appellant ABC, Dkt. No. 1494650 (May 27, 2014) ("Appellant's Br.") 12.
[3] Appellant's Br. 13.

6

regulations, the construction industry vigorously opposed them.  Ultimately the

Department of Labor rejected the construction industry's objections.

To set aside the data collection provisions would gut the Rule of a vital tool

to further one of the Rehabilitation Act's fundamental goals: to ensure that

government contractors are making vigorous efforts to recruit and hire people with

disabilities and indeed are leaders in integrating people with disabilities into the

workplace.  To set aside the utilization goal in the new Rule based on the false

contention that there are not enough qualified people with disabilities to work in

physically hazardous jobs, would yield to the very falsehoods about people with

disabilities that the Rehabilitation Act was enacted to combat.

## ARGUMENT

**I.     The purpose of Section 503 of the Rehabilitation Act was to ensure that federal contractors would be leaders in integrating people with disabilities into the workplace.**

In enacting the Rehabilitation Act, Congress recognized that stereotypes and

prejudices prevented individuals with disabilities from achieving their full

employment potential.  Indeed, Congress explicitly stated that the Rehabilitation

Act was necessary because "individuals with disabilities constitute one of the most

disadvantaged groups in society;" because "individuals with disabilities

continually encounter various forms of discrimination in such critical areas as

employment;" and because the federal government was uniquely positioned to

promote their "full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society."  29 U.S.C. § 701(a), 29 U.S.C. § 701(b)(2).

Consequently, an express purpose of the Act is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society" by, *inter alia*, "the guarantee of equal opportunity."  29 U.S.C. §§ 701 (b).  Further, Congress stated that "[i]t is the policy of the United States that all programs, projects, and activities receiving assistance [under the Rehabilitation Act] shall be carried out in a manner consistent with the principles of . . . inclusion, integration, and full participation of [individuals with disabilities]."  *Id.* § 701 (c).

Thus, Section 503 orders contractors receiving high dollar value contracts from the federal government to "take affirmative action to employ and advance in employment qualified individuals with disabilities."  29 U.S.C. § 793(a).  The Department of Labor's new regulations constitute a reasonable response of the federal government to this mandate, particularly in light of the Department's decades of experience with prior regulations that did not result in meaningful improvement in contractors' employment of people with disabilities.

**II.     The Department of Labor appropriately imposed data collection requirements on the construction industry.**

The Department of Labor appropriately concluded that a utilization goal was important after the prior Section 503 regulation for decades brought little improvement in the employment of people with disabilities among federal contractors.  People with disabilities had low employment rates at the time that the Rehabilitation Act was passed and, more than 40 years later, continue to be employed at a fraction of the rate of employment of people without disabilities.  In 2012 people with disabilities had a labor force participation rate of 20.6%, compared with 69.4% for people without disabilities.[4]  The 2009 American Community Survey, which uses the same definition of disability as the CPS, shows similar results, with 23% of people with disabilities participating in the labor force compared to 65.8% of people without disabilities.  This stagnation has occurred despite the protections of the Rehabilitation Act, the ADA and the existing Section 503 regulations.

The agency acted reasonably in determining that affirmative action efforts should include the collection of basic data so that contractors and the Department of Labor can analyze whether particular outreach, recruitment, and retention strategies are working.  Common sense dictates that meaningful efforts include

---

[4] Bureau of Labor Statistics, Table A, Employment status of the civilian noninstitutional population by disability status and age, 2012 and 2013 annual averages, available at www.bls.gov/news.release/disabl.a.htm.

data collection that looks at applicant flow and overall employment rates of people with disabilities to determine whether such strategies are succeeding or whether they should be modified. And history has shown that without such data collection, little progress will be made. Employment rates for people with disabilities remain abysmal. The construction industry should not be excluded from data collection requirements based on the nature of construction industry jobs or the nature of disability versus other categories of required data collection (like race, gender, or veteran status).

### III. Data collection concerning all job applicants with disabilities, regardless of whether they have yet been deemed "qualified" for a specific position, serves the goals of the Rehabilitation Act.

ABC contends that the Department of Labor has exceeded its rulemaking authority by applying its data collection requirement to all applicants with disabilities even if they are ultimately not deemed "qualified" for a particular position. As discussed above, the Rehabilitation Act was enacted to prevent discrimination against people with disabilities based on stereotypes or assumptions. Although the affirmative action provision in Section 503 mentions "qualified" individuals with disabilities, data collection concerning all job applicants with disabilities, regardless of whether they have yet been deemed "qualified" for the specific position, serves the goals of the Rehabilitation Act.

The requirements are an important tool to help contractors as well as OFCCP determine how well their outreach and recruitment strategies are working and whether they should modify these strategies, whether their hiring process is inappropriately screening out people with disabilities who may be qualified, and whether the contractor is using effective strategies to retain employees with disabilities. Data collected pursuant to the Rule will create a picture of how people with disabilities fare in the application and hiring process, by providing information on how many people with disabilities are applying for particular jobs and how many are being hired. If the percentage of applicants with disabilities rises or falls dramatically from one year to the next, or if it remains extremely low year after year, these indicators enable contractors and OFCCP to scrutinize requisite outreach and recruitment practices to determine what is working and what is not. If the percentage of individuals with disabilities hired is significantly lower than the percentage of applicants with disabilities, contractors and OFCCP might review hiring practices to identify whether applicants are being screened out unfairly based on disability. If the percentage of employees identifying themselves as having disabilities rises or falls significantly over time, such changes may alert contractors and OFCCP to examine whether employees are receiving reasonable accommodations that they need to stay on the job, and whether other retention strategies should be modified. Finally, contractors may use the information

gathered to explore whether individuals with disabilities who may not be qualified for the position for which they applied may be qualified for a different position.

Limiting data collection to individuals who are "qualified" for particular positions is therefore <u>unnecessary</u> to the effectiveness of the provision, Contractors are of course free to analyze the data both before and after qualification determinations have been made, to further inform their outreach and recruitment efforts under Section 503.

Through this valuable data collection, OFCCP and contractors can take concrete steps to further the goals of the Rehabilitation Act, including identifying why unemployment rates are so high among people with disabilities and taking appropriate steps to address that problem as part of implementing an affirmative action plan. Employers are still entitled to make the determination of whether an individual with a disability is qualified on a case-by-case basis as required by law.

## IV.    The Department of Labor appropriately imposed a utilization goal for employment of people with disabilities on all industries, including the construction industry.

The Department of Labor's decision to include all industries, including the construction industry, in its new Section 503 regulations recognizes that people with all kinds of disabilities, including both physical and mental impairments, can and do perform the kinds of physically demanding, hazardous, and/or transitory work characteristic of some jobs in the construction industry. The Department's

12

new utilization goal of 7% is necessary because people with disabilities have

historically been kept out of and discouraged from entering the workforce due to

precisely the kinds of stereotypes and assumptions ABC relies on here.  People

with disabilities vary widely in terms of their capabilities and limitations; and

similarly, construction industry jobs vary widely in terms of their demands.  The

industry should thus not be exempted from rules that encompass a broad spectrum

of jobs and businesses, and that are intended to remedy the historic exclusion of

people with disabilities from the workforce.

###        a.        The utilization goal is appropriate and achievable because people with disabilities can and do perform construction industry jobs.

ABC's contention that the new Rule should be invalidated because it "failed

to differentiate between physically hazardous occupations such as those in the

construction industry and other types of jobs and industries," is unfounded.  *See*

Appellant's Br. 13.

ABC's contention that there are not enough qualified individuals with

disabilities to work in the industry's physically demanding and hazardous jobs is

based on a limited understanding of the capabilities of people with disabilities.

First, ABC ignores the fact that a vast number of people with disabilities are

unlimited in the ability to perform "physically demanding"[5] work, including work

in the construction industry.  For example, a person with an auditory processing

---

[5] Appellant's Br. 25.

disorder could work as carpenter (and would typically need no accommodation to do so).  A person with a significant stutter could operate machinery (and would ordinarily need no accommodation).  A person with a mental illness could work in any number of construction industry jobs (again, likely without accommodation). And many other people with disabilities can perform work in the construction industry with a reasonable accommodation, as required by law.  *See* 42 U.S.C. § 12112; 29 U.S.C. § 791(g).  For example, a wheelchair user might not be able to climb a ladder, but he could reach items at the top of the ladder by using a scissor lift.

The number of workers with disabilities already in the construction industry demonstrates that the Labor Department's 7% utilization goal is appropriate as a benchmark for affirmative action efforts.  According to the U.S. Census Bureau's 2012 American Community Survey (ACS), 5.5% of construction industry employees are people with disabilities, and the construction industry ranks sixth out of the thirteen industries surveyed in terms of the percentage of people with disabilities employed.[6]  These numbers are not significantly different from the 5.7% of individuals with disabilities the Department of Labor estimates are in the

---

[6] *See* United States Census Bureau, 2012 American Community Survey 1-Year Estimates, Selected Economic Characteristics for the Civilian Noninstitutionalized Population by Disability Status (available at factfinder2.census.gov /faces/tableservices/jsf/pages/productview.xhtml? src=bkmk as of July 2, 2014).

workforce in general, a percentage the Department seeks to increase across

industries through the promulgation of the new Section 503 regulations.

Indeed, people with disabilities can and do perform a wide variety of

"physically demanding," "hazardous," and "transitory" jobs throughout the

workforce.[7]   The United States Census Bureau reports that nearly three million

people with disabilities worked in the highly-physical job categories "craft

workers," "laborers and helpers," "operatives," and "technicians" between 2008-

2010.[8]  *See also* EEO-1 Job Classification Guide (available at

www.eeoc.gov/employers/eeo1survey/jobclassguide.cfm as of July 2, 2014) (the

term "Craft Workers" includes "Brickmasons, Blockmasons, and Stonemasons,"

"Carpenters," "Miscellaneous Construction Equipment Operators," "Painters,

Construction and Maintenance," "Electricians," "Hazardous Materials Removal

Workers," "Elevator Installers," "Security and Fire Alarm Systems Installers,"

"Heating, Air Conditioning, and Refrigeration Mechanics and Installers," and

"Crane and Tower Operators," among many others; "Laborers and Helpers"

include "Construction Laborers," "Helpers, Construction Trades," and "Helpers –

---

[7] *See* Appellants' Br. 40 (describing jobs in the construction industry as "uniquely physical and transitory"); *id.* at 13 (describing jobs in the construction industry as "physically hazardous").

[8] Disability Employment 3: EEO-1 Job Categories by Disability Status, Sex, and Race/Ethnicity, Total Population, Number Universe, DOL Disability Employment Tabulation 2008-2010 (3-year ACS data) (available at http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview. xhtml?src=bkmk as of July 2, 2014).

Installation, Maintenance, and Repair Workers;" "Operatives" include "Welding, Soldering, and Brazing Workers," "Painting Workers," and "Truck Drivers;" and "Technicians" include "Drafters" and "Engineering Technicians.").

The federal government's own employment of people with disabilities further undermines ABC's assumption that there are not enough individuals with disabilities qualified to work in construction.  Data from the Office of Personnel Management shows that the federal government directly employs significant percentages of people with disabilities in jobs that are "physically demanding," "hazardous," and "transitory."[9]  For example, 17% of elevator mechanics employed by the federal government in 2012, as well as 8% of forklift operators, 12% of people working in hazardous waste disposal, and 7% of park rangers, were people with disabilities.  *Id.*

Courts considering employees' disability discrimination claims under the Americans with Disabilities Act and the Rehabilitation Act have rejected numerous arguments by employers based on unfounded assumptions that people with disabilities cannot perform physically demanding or hazardous jobs.  *See, e.g., Rodriguez v. ConAgra Grocery Prod. Co.*, 436 F.3d 468 (5th Cir. 2006) (reversing district court's grant of summary judgment to employer based on evidence that

---

[9] Data based on communications between *amici* and Office of Personnel Management in January 2014.  *See* Exhibit A for underlying data and further examples.

applicant with diabetes could work in production at food manufacturing plant; noting that applicant had previously "performed heavy manual labor, including unloading delivery trucks and lifting heavy sacks" at same plant); *Echazabal v. Chevron USA, Inc.,* 336 F.3d 1023 (9th Cir. 2003) (reversing district court's grant of summary judgment to employer based on evidence that applicant with asymptomatic hepatitis C could perform maintenance position at oil refinery plant); *Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11 (1st Cir. 2002) (reversing district court's grant of summary judgment to employer based on evidence that applicant with genetically amputated arm could perform Emergency Medical Technician position, including lifting patients; noting that applicant successfully worked as EMT for different ambulance service during pendency of litigation); *Lowe v. Alabama Power Co.,* 244 F.3d 1305 (11th Cir. 2001) (reversing district court's grant of summary judgment to employer based on evidence that employee with double leg amputations could perform mechanic position at steam plant); *Holiday v. City of Chattanooga,* 206 F.3d 637 (6th Cir. 2000) (reversing district court's grant of summary judgment to employer based on evidence that applicant with HIV could work as police officer).  With the exception of *Lowe v. Alabama Power Co.,* the plaintiffs in these cases did not request or need reasonable accommodations to perform the positions at issue – the defendants denied them employment based on stereotypes and assumptions about their ability to perform

17

the jobs in question – but many people with disabilities can also perform physically demanding, hazardous, and transitory jobs as long as the reasonable accommodations required by the Rehabilitation Act and the ADA are provided. *See* 42 U.S.C. § 12112; 29 U.S.C. § 791(g).

> **b.    Contractors made similar arguments concerning utilization goals for employment of women, and those arguments were rejected as unfounded.**

More than thirty years ago, the construction industry made similar arguments when it opposed the imposition of a utilization goal for the hiring of women in regulations promulgated pursuant to Executive Order No. 11246.  43 Fed. Reg. at 14888 (1978) (regarding 41 C.F.R. § 60-4.6.  Those arguments were rejected as unfounded.

In imposing a utilization goal for federal construction contractors' employment of women, the Department of Labor contrasted the near-total exclusion of women from the construction industry workforce with women's significant and untapped interest in construction industry jobs.  43 Fed. Reg. at 14893 (noting the "gross disparity between the percentage of women in the labor force and the percentage of women in the construction trades").  But the construction industry claimed, as ABC does here, that there were not enough qualified women to meet the utilization goals.  *Id.* at 14892-93.  The construction industry's comments in response to the proposed rule at that time "characterize the

18

goal levels as quotas and state that the goals would require contractors to hire

unqualified persons, that qualified women craft workers are not available, that

contractors would be required to displace other workers with women because of

high unemployment in the industry, and that the required actions, particularly the

recordkeeping requirements, placed an additional cost burden on contractors which

would be difficult for small contractors to absorb." *Id.* at 14888.

The Department rejected these arguments and promulgated 41 C.F.R. § 60-4,

citing census data and testimony that demonstrated that the underrepresentation of

women in the construction industry was not the result of a lack of interest among

women.  43 Fed. Reg. at 14888.  Based on these findings, the Department

concluded that "unless specific affirmative action steps are prescribed, construction

employment opportunities will not reach the female workforce of this country."

*Id.*[10]  Although the utilization goals for women were structured somewhat

differently than the utilization goals in the rule at issue in this case, it is the same

out-moded thinking that led to the construction industry's resistance to a utilization

goal for hiring women that underpins ABC's arguments here.  As the Department

---

[10] Before 41 C.F.R. § 60-4 was promulgated, the federal government's rules implementing Executive Order No. 11246 initially failed to include goals for women in the construction industry.  In 1977, after President Carter took office, the Department of Labor settled a lawsuit brought by women challenging the absence of such goals and promulgated 41 C.F.R. § 60-4.  The Labor Department, in promulgating this rule, rejected the reasoning of the prior Administration concerning the setting of goals for women.

did then, the district court properly rejected these arguments and this Court should affirm the district court's holding.

### c.    Differences among industries do not make a utilization goal inappropriate.

Although, as discussed above, the construction industry is not unique with respect to its employment of people with disabilities, eliminating utilization goals for every industry that claims to be unique would quickly render the Rehabilitation Act's requirements meaningless.

Many industries include physically demanding, hazardous, and transitory jobs, but are not exempt from compliance with Section 503 of the Rehabilitation Act. *See, e.g.,* Occupational Safety and Health Administration (OSHA), 2012 Survey of Occupational Injuries and Illnesses, November 7, 2013 (available at http://www.bls.gov/iif/oshwc/osh/os/osch0049.pdf as of July 2, 2014) (listing "Construction" below "Health care and social assistance," "Manufacturing," "Retail trade," "Accommodation and food services," and "Transportation and warehousing" in rates of "nonfatal occupational injuries and illnesses.").

Ironically, industries with relatively few "hazardous" or "physically demanding" jobs also objected to the new Rule, based on their "unique" status. For example, Thomas Shanahan, General Counsel at the University of North Carolina, testified before the House Education and the Workforce Committee in opposition to the new Rule based on the "unique" nature of the higher education

20

workforce. *See* Statement by Thomas C. Shanahan, Vice President for Legal Affairs and General Counsel, The University of North Carolina, Before the House Education and the Workforce Committee, Subcommittee on Workforce Protections, Hearing on Examining Recent Actions by the Office of Federal Contract Compliance Programs, December 4, 2013, at 9, (available at http://edworkforce.house.gov/uploadedfiles/shanahan_testimony.pdf as of July 2, 2014) (objecting to the utilization goal for "organizations of the size, complexity, and multiple occupational categories" typical of higher education); *id.* at 10 (objecting to the new Rule based on the "nature of our workforce"); *id.* at 8 (describing "some of the unique characteristics and organization of university employment and organization").

If the Department of Labor were to exempt higher education or the construction industry from these regulations, it would open the flood gates to requests for exemptions from every industry. If such differences were permitted to exempt industries from the utilization goal, the goal would apply to almost no one.

     **d.**     **The 7% utilization goal provides flexibility and should not be difficult to meet.**

          **1.**     **A broad group of people with disabilities count toward the 7% goal.**

Meeting a utilization goal of 7% should not be difficult for ABC's members. This goal was derived from estimates using Census Bureau data encompassing a

narrow group of individuals with disabilities.[11]  By contrast, a far broader group of individuals with disabilities count toward the 7% goal.  The affirmative action provisions of Section 503 apply to *all* individuals with a disability as that term is defined in the ADA: anyone with a physical or mental impairment that substantially limits a major life activity (including a major bodily function), or with a history of such an impairment.  29 U.S.C. §§ 793, 705(20)(B); 42 U.S.C. § 12102.  Section 503's definition of disability was significantly broadened by Congress in the ADA Amendments Act of 2008, which specified that the standard is to be "construed in favor of *broad coverage* . . . to the maximum extent permitted by the terms of [the ADA and the Rehabilitation Act]." 42 U.S.C. § 12102 (j)(1)(i).

The group of individuals with disabilities covered by Section 503 is broader than the group covered by the Census Bureau data in other ways as well.  As the Department has pointed out, the individuals counted toward the 7% goal include people whose impairments substantially limit major bodily functions (such as kidney, liver, endocrine, or immune function) even if they do not substantially

---

[11] Those who are deaf or have serious difficulty hearing; who are blind or have serious difficulty seeing; who have serious difficulty concentrating, remembering or making decisions due to a physical, mental or emotional condition; who have serious difficulty walking or climbing stairs; who have difficulty dressing or bathing; or who have difficulty doing errands alone due to a physical, mental or emotional condition.  The Department of Labor based its 7% goal on the American Community Survey, which captures data on individuals in these categories.  *See* https://www.census.gov/people/disability/methodology/acs.html.

limit activities such as hearing, seeing, walking, bathing, climbing stairs or other

activities captured by the Census Bureau data.  The individuals counted toward the

7% goal also include people whose limitations are partially or completely

controlled by mitigating measures (such as medication, therapies, and other

interventions); by contrast, the Census Bureau does not ask people whether they

would meet the definition of disability absent mitigating measures.[12]

Moreover, the U.S. Equal Employment Opportunity Commission (EEOC)

estimated that even a *subset* of the individuals covered by the ADA and Section

503 (those whose impairments will virtually always be disabilities under these

laws, but were not clearly covered before the 2008 amendments to the ADA and

the Rehabilitation Act) constitutes approximately 60 million people, or about 20%

of the population.[13]  Thus the entire group of individuals covered by Section 503

should be well above 20% of the population.

---

[12] *See* Dep't of Labor, Office of Federal Contract Compliance Programs, Final
Rule, Affirmative Action and Nondiscrimination Obligations of Contractors and
Subcontractors Regarding Individuals With Disabilities, 78 Fed. Reg. 58682,
58703-04 (Sept. 24, 2013), www.gpo.gov/ fdsys/pkg/FR-2013-09-24/pdf/2013-
21228.pdf.
[13] *Id*. at 16990-91.

Indeed, because the group of individuals that count toward Section 503's utilization goal is so broad, disability groups had recommended that the Department adopt a *higher* utilization goal of 10%, rather than 7%.[14]

Furthermore, failure to meet the goal does not constitute a violation of Section 503 as long as a contractor is undertaking the measures required by the regulations. The goal is simply a benchmark that is used to determine whether a contractor's practices are working or would benefit from a different approach.

### 2.    People with disabilities now represent almost 12% of employees across the federal government, including in physically demanding jobs.

Moreover, the percentage of federal government employees who have disabilities demonstrates that a 7% utilization goal is reasonable. Due in part to the federal government's efforts to implement Executive Order No. 13548, which in 2010 set specific goals for federal agencies' recruitment and hiring of people with disabilities, people with disabilities now represent almost 12% of employees across the federal government.[15] This number is increasing – 16.31% of new hires in

---

[14] *See, e.g.,* Comments of Consortium of Citizens with Disabilities members submitted Feb. 21, 2012 in response to the Department's Notice of Proposed Rulemaking, available at
http://www.bazelon.org/portals/0/employment/503%20comments%20CCD%202% 2021%2012.pdf as of July 2, 2014.

[15] OPM, Employment of People with Disabilities in the Federal Executive Branch FY 2012 Report (Dec. 19, 2013), available at www.opm.gov/policy-data-oversight/diversity-and-inclusion/reports/disability-report-fy2012.pdf as of July 2, 2014.

2012 were people with disabilities.  *Id.*  Moreover, as noted above, hundreds of

thousands of people with disabilities who work for the federal government perform

jobs that entail significant physical demands.  It is clear that 7% is an eminently

achievable goal.

     In sum, the construction industry is not so unique, and people with

disabilities are not so incapable, as to invalidate the Labor Department's utilization

goal with respect to the construction industry.  Effective affirmative action

requirements for federal contractors, including in the construction industry, are

critical to furthering the goals of inclusion and integration adopted by Congress in

the Rehabilitation Act.

## CONCLUSION

     After earlier regulations "resulted in little improvement in the

unemployment and workforce participation rates of individuals with disabilities,"[16]

the Department appropriately promulgated the regulations at issue.  Federal

contractors' affirmative action obligations with respect to race and gender have

long included such utilization goals and data collection; the new Section 503

regulations bring sorely needed updates to similar protections for individuals with

disabilities.  These are important steps in the right direction, and *amici* strongly

---

[16] U.S. Dep't of Labor, Office of Federal Contract Compliance Programs, Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals with Disabilities, Notice of Proposed Rulemaking, 76 Fed. Reg. 77056, 777069 (Dec. 9, 2011).

urge the Court not to set them aside based on Appellant ABC's outdated and

narrow view of the capabilities of people with disabilities, who, contrary to

Appellant's assertions, can and do work in many occupations that are physically

demanding, hazardous, and/or transitory.  To hold otherwise would be to

undermine the intent of Congress, as set forth in the Rehabilitation Act, to promote

the "full inclusion and integration in the economic, political, social, cultural, and

educational mainstream of American society" of people with disabilities.  29

U.S.C. § 701 (b)(2).

> Respectfully submitted,
>
> /s/ Daniel F. Goldstein
> Daniel F. Goldstein
> Laura Ginsberg Abelson
> Brown, Goldstein, & Levy
> 120 Baltimore Street, Suite 1700
> Baltimore MD 21202
> (410) 962-1030
> dfg@browngold.com
> labelson@browngold.com
>
> Jennifer Mathis (D.C. Bar No. 444510)
> Emily B. Read (D.C. Bar No. 492773)
> The Judge David L. Bazelon
> Center for Mental Health Law
> 1101 15th Street NW, Suite 1212
> Washington DC 20005
> (202) 467-5730
> jenniferm@bazelon.org
> emilyr@bazelon.org
>
> *Counsel for Amici*

26

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS
## AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(A) because this brief contains 5,395 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in a 14-point Times New Roman font.

Respectfully submitted,

Date:  July 3, 2014                    By:  _____/s/_____

Daniel F. Goldstein
*Counsel for Amici*

27